TITUS & SCUDDER v. THE CAIRO AND FULTON RAILROAD COMPANY.

1. Except where a known usage of trade justifies, or necessity requires, the employment of subagents, an agent whose powers and duties involve personal trust and confidence and the exercise of judgment and discretion, cannot, without authority from his principal, delegate to another the confidence and discretion reposed in him. Having, by his own judgment and discretion, determined what should be done, he may authorize another to perform the ministerial acts necessary to carry into effect the purposes of his employment, but he cannot turn his principal's business over to the judgment and discretion of another, and bind his principal by the acts and conduct of the latter.

2. Knowledge by the principal of the unauthorized act of the agent in assuming to make a contract for him, which the agent had no power to make, is essential to a ratification of the agent's act. If the agent fraudulently misrepresented his authority, and the principal has received the avails of the fraud without knowledge of the agent's fraudulent conduct, the remedy of the party injured against the principal is not upon the contract in damages, but by rescission of the contract and suit for the consideration paid.

3. A railroad company contracted with P. and G. for the construction of its road, the first section of which was to be completed on or before May 1st, 1869. The consideration to be paid for the work was (*inter alia*) $23,000 per mile in the company's bonds, to be issued to the contractors on the completion of each twenty miles of the road, and $7000 per mile of the company's paid-up capital stock. The contract also provided that if the contractors should desire the issue and delivery of bonds in advance of the payments for work done, for the purpose of the more rapid completion of the work, the company should deliver the same in sufficient amounts, on satisfactory security being given therefor. P. and G., the contractors, by a personal contract between them for a division of the profits to be realized from the contract, agreed that G. should receive for his share $3000 of the company's bonds and $2000 of its stock for each mile of railroad constructed and paid for under the construction contract, and that the president of the railroad company be authorized and requested to deliver to G. or his order the said bonds and stock as fast and whenever issued under the construction contract. The president of the company approved of this latter contract, and agreed that the bonds and stock would be issued accordingly. G. agreed with the plaintiffs to sell them, for the consideration paid of $5000, twenty-five of the company's bonds of $1000 each, and gave them orders on the president of the company for the delivery to them of said bonds out of the first issue of bonds thereafter to be made under the personal contract between P. and G. The president accepted these orders. No work was done by P. and G. under the construction contract, and on May 20th, 1870, the company annulled the construction contract for the default of the contractors in not proceeding with the work. In an action against the company—*Held*—

1. That the company's contract with the plaintiffs by the acceptances being for the delivery of the bonds on a contingency, the plaintiffs could not recover without showing that the contingency had happened or that its performance was prevented by an act of the company which was wrongful and without legal justification.

2. That bonds delivered by the president to P. and G., to enable them to sell their contract, and without security being given therefor, were not bonds issued under the contract within the meaning of the orders and acceptances.

3. That the company was not, by the approval of the personal contract between P. and G., nor by the acceptances, concluded from annulling the construction contract for the default of the contractors in not proceeding with the work, and that there had been such failure of the contractors in performance of their contract as justified the company in annulling the contract by the resolution of May 20th, 1870.

This action was brought to recover damages for the failure to deliver bonds of the Cairo and Fulton Railroad Company. Titus & Scudder negotiated, in the winter of 1867–68, with one Columbus B. Guthrie, for the purchase of twenty-five of the company's bonds of $1000 each for the sum of $5000. The bonds not having been delivered on demand, Titus & Scudder sued the company for damages for non-delivery.

The company, on the 20th of June, 1867, entered into a contract with Joseph C. Potts and Columbus B. Guthrie, known by the firm name of Joseph C. Potts & Co., for the construction of its railroad from the Missouri boundary to the Arkansas river, a distance of about one hundred and sixty-one miles. The contract was in writing and under seal, between Potts and Guthrie of the first part, and the Cairo and Fulton Railroad Company of the second part. It provided for the construction of the road in sections as follows: twenty miles before January 1st, 1869; thirty miles before January 1st, 1870; thirty-three miles before January 1st, 1871, and the remainder before January 1st, 1875. For the work to be done the company agreed to pay $40,000 per mile, payable as follows: (1) $10,000 per mile in the eight per cent. bonds of the State of Arkansas, to be issued pursuant to an act of the legislature entitled "An act loaning the faith and credit of the state in aid of the construction of railroads," to be paid to the contractors as fast and whenever the same could be procured " upon work done by them in compliance with the terms of said act;" (2) $23,000 per mile in the seven per cent. land-grant bonds of the company, of the first issue of $5,000,000, payable in twenty-five years from November 1st, 1867; (3) $7000 per mile in the paid-up capital stock of the company.

The contract provided that the bonds and stocks above mentioned should be payable on the completion of each twenty miles of the road named in the contract, and that Potts and Guthrie should pay the interest that might accrue on all bonds delivered to them until the date fixed for the completion of the work.

The contract contained these other provisions: (1) that if at any time Potts and Guthrie should desire the issue and delivery to them of the bonds of the company in advance of the payments provided for in the contract, for the purpose of obtaining means for the more rapid progress of the work than was stipulated for in the contract, the company should deliver the same in sufficient amounts, on satisfactory security being given therefor; and (2) that the contract should not be transferred or assigned, in whole or part, without the consent of the company, but might be modified and changed by the parties thereto. These provisions are contained in sections 5 and 6 of the contract.

On the same date of the contract with the company, Potts and Guthrie executed a contract between themselves. This contract recited the terms of their contract with the company, and provided for the division of their compensation for the execution of the work as follows: that for every mile of railroad constructed and paid for under said contract Guthrie should receive for his full interest and share in the contract with the company, and in the profits, $3000 of the land·grant bonds and $2000 of the paid-up stock, and that the balance of the payments and profits, after paying for the construction of one hundred and sixty-one miles of railroad, should issue solely to Potts and his associates and assigns; and the president or other proper authority of the railroad company was directed and authorized to deliver to Guthrie, or to his order, the said bonds and stock in just proportion to the whole sum, as fast and whenever issued under the provisions of their contract with the company.

The individual contract between Potts and Guthrie was submitted to the president of the railroad company, and he

endorsed on it his approval in these words: "New York, June 24th, 1867. The above contract is approved, and stock and bonds will be issued accordingly. M. Brayman, Prest. C. & F. R. R. Co."

Brayman was president of the railroad company from May, 1859, to May 1st, 1861, and again from May 18th, 1865, until May, 1870. Guthrie was a director from May, 1856, to May, 1857. He was not a director when the construction contract was executed, nor afterwards. In November, 1859, the directors of the company ordered an issue of bonds to the amount of $5,000,000, and conveyed its lands to trustees to secure the payment of these bonds. On the 9th of May, 1867, the directors, by a resolution, withdrew this issue of bonds, and replaced them by ordering a new issue of like bonds, payable in twenty-five years from the 1st of November, 1867. These last bonds were the bonds referred to in the construction contract between Potts and Guthrie and the company as "the seven per cent. bonds of the company, being the first issue of five millions of dollars."

At a meeting of the board of directors, held November 2d, 1859, it was ordered "that the president of this company have custody of the bonds and securities issued from time to time for its use, with powers to use and dispose of the same by sale, hypothecation or otherwise, on such terms and in such manner as he shall deem for the interest of this company, and to apply the same or the avails thereof in procuring money, iron rails, equipment and furnishing for the road of this company, in paying transportation and cost of materials in establishing and constructing this road and its necessary appurtenances, and in the paying such charges and expenses as may be necessary to secure the above object; that for such purpose he have power to conclude, contract and execute obligations, under seal or otherwise, and to carry the same into effect, making due report from time to time of what he shall do, accompanied by accounts of receipts and expenditures growing out of the duties hereby imposed."

Guthrie's authority to act as agent was derived from two

documents—a letter from Brayman, of May 18th, 1866, in which he says, " In compliance with authority vested in me, I hereby appoint [you] an agent to receive subscriptions to the stock of this company ; " and the following circular letter:

" OFFICE CAIRO AND FULTON R. R. Co.,
    SPRINGFIELD, ILLS., Oct. 17th, 1866.

" Dr. C. B. Guthrie, of 81 Cedar street, New York, is a director of this company. By virtue of authority vested in me as president thereof, I hereby appoint and constitute him the general financial agent of this company for the city of New York, with authority to secure stock subscriptions and receipt for payments ; to negotiate loans ; to arrange contracts for construction and equipment ; to incur and adjust expenses, and in general to take care of the interests and affairs of this company in the city of New York, making report from time to time of what he may have done.

" M. BRAYMAN,
" *President C. & F. R. R. Co.*"

The negotiation began in January or the early part of February, 1868. It was conducted throughout between Titus & Scudder on the one side, and Guthrie on the other side—Potts being present and taking part in some of the interviews. None of the negotiations were had with Brayman or any other officer of the company, personally. While they were pending, Titus wrote the following letter to Brayman, of the date of February 6th, 1868 :

" GENERAL MASON BRAYMAN :

" *Dear Sir*—Having learned that you were the president of the Fulton and Cairo railroad, we write you for some information respecting said road, and would thank you for an answer to the following questions : First, Will the road be built, and when will the work be commenced ? Second, Will the grants made by the State of Arkansas and the general government be sufficient to build and complete the road ? And third, Will the interest on the bonds (seven per cent.

land-grant) be punctually paid, commencing on the 1st day of May, 1869? A candid reply by return mail will confer a great favor upon those who are favorable to all such enterprises that go towards the development of this great country.

"Feb. 6th, 1868. Yours respect.,

"TITUS & SCUDDER."

To this letter Brayman sent the following reply:

"SPRINGFIELD, ILLINOIS, February 10th, 1868.
"MESSRS. TITUS & SCUDDER, Trenton, New Jersey:

"*Gentlemen*—Your letter of inquiry, dated the 6th, is this morning received. I will briefly answer your questions.

"1. The road will be built, undoubtedly.

"2. Will be commenced on the one hundred and sixty-one miles between Little Rock and the Missouri boundary, as soon as reconstruction is assured—a contract having been made with responsible parties, who only await that event—until which securities from late rebel states cannot be put on the market.

"3. The grants of land, (sixty-four hundred acres per mile,) and state bonds, ($10,000 per mile,) are regarded as ample to build the road. An effort is in progress to secure congressional aid, like unto the Union Pacific.

"4. The road, three hundred and one miles, brings one million nine hundred and twenty-six thousand four hundred acres of lands. On this we issue only $5,000,000 of seven per cent. twenty-five-year bonds, (including in proper deed of trust all other property,) which is at the rate of $2.60 per acre, and the deed of trust forbids their sale at less their average, $5. From these facts you can judge the safety of investment. No bonds are yet in market, and will not be until ready to be *placed* for means to build, and then only upon ample provision for paying interest promptly; it being intended to bring these bonds upon the stock market at the proper time as an acceptable and strong security.

"For your better information, I will refer you to Messrs. J. C. Potts & Co., 72 Cedar street, N. Y., who are contractors

for the one hundred and sixty-one miles referred to, in whom I have great confidence, and through whom our financial arrangements will doubtless be made.

"Respectfully yours, &c.,

"M. BRAYMAN,

*President.*

Titus says that Brayman's answer was received before the negotiations were concluded, and that the plaintiffs negotiated for the bonds on the faith of that.

Part of this transaction was an agreement of Guthrie of February 15th, 1868, which, with Potts' guaranty annexed, is in these words:

"Articles of agreement made and entered into this fifteenth day of February, eighteen hundred and sixty-eight, between Columbus B. Guthrie, of the first part, and Benjamin W. Titus and Uriel T. Scudder, partners trading as Titus & Scudder, of the second part, witnesseth—

"1st. That the party of the first part agrees to sell to the party of the second part twenty-five of the land-grant mortgage bonds of the Cairo and Fulton Railroad Company, of Arkansas, to be issued to the said party of the first part, pursuant to a contract between the said party and Joseph C. Potts, dated the twentieth day of June, eighteen hundred and sixty-seven, and approved by Mason Brayman, Esq., president of the said company, on the twenty-fourth of June, eighteen hundred and sixty-seven, and the said party of the first part will deliver to the party of the second part accepted orders upon the said Mason Brayman, president, to deliver to the said party of the second part, out of the first issue of the land-grant mortgage bonds by the said company, under the contract with the said Joseph C. Potts, the said twenty-five bonds of one thousand dollars each.

"2d. In consideration whereof, the parties of the second part hereby agree to pay to the party of the first part the sum of five thousand dollars, in manner and form to wit, one thou-

sand dollars upon the execution of this agreement, one thousand dollars on the fifteenth of March next, one thousand dollars on the fifteenth of April next, and the remaining two thousand dollars on the first day of June next.

"3. The party of the first part further agrees that if for any cause default should be made in the delivery of the said bonds to the party of the second part, on or before the expiration of one year from the first day of May next, that then and in that case he, the party of the first part, will repay to the said party of the second part the said sum of five thousand dollars, with the interest thereon.

"Witness the hands of the said parties the day and year first above written.

"C. B. GUTHRIE.

"Witness present at the signing of C. B. Guthrie.

"BENJ. C. POTTS.

"Messrs. Titus & Scudder performing the above agreement on their part, I hereby guarantee that the above-mentioned twenty-five bonds of one thousand dollars each will be issued by the Cairo and Fulton Railroad Company, of Arkansas.

"Dated Feb. 15th, 1868.

"Jos. C. POTTS."

Guthrie also drew the following orders:

"M. BRAYMAN, ESQ., President Cairo and Fulton Railroad Company, of Arkansas:

Sir—Pursuant to the contract between Joseph C. Potts and myself, dated the 20th day of June, 1867, and approved by you at same date, please deliver to the order of B. W. Titus, out of the first issue of the bonds of the Cairo and Fulton Railroad Company, of Arkansas, hereafter to be made under said contract, and coming to me, fifteen (15) bonds of one thousand dollars each, and this shall be your voucher for the same, and oblige yours.

"New York, April 6th, 1868.

"C. B. GUTHRIE.

"Springfield, Ill., April 14th, 1868.

"Accepted.

"M. Brayman,

"*President Cairo and Fulton Railroad Company.*"

"New York, June 1st, 1868.

"M. Brayman, Esq., President Cairo and Fulton Railroad, of Arkansas:

*Sir*—Pursuant to the contract between J. C. Potts and myself, dated the 20th of June, 1867, and approved by you June 24th, 1867, please deliver to the order of B. W. Titus, out of the first issue of bonds of the Cairo and Fulton Railroad Company, of Arkansas, hereafter to be made under said contract and coming to me, ten (10) bonds of one thousand dollars each, and this shall be your receipt for the same, and oblige            Yours, &c.,

"C. B. Guthrie.

"Office Cairo and Fulton Railroad Co., ⎱
          Little Rock, Ark., June 9th, 1868. ⎰

"Accepted.    Payable when bonds are issuable upon the contract within referred to.

"M. Brayman,
          "*President and Financial Agent.*"

These orders Guthrie forwarded to Brayman by mail April 6th and June 1st, 1868.   They were returned to Guthrie by mail April 14th and June 9th, 1868, with the acceptances endorsed, and were forwarded by Guthrie to Titus & Scudder at Trenton, and were endorsed by Mr. Titus, "Pay to the order of Titus & Scudder.   B. W. Titus."

The suit was tried first in 1873, and resulted in a finding for the plaintiffs.   On rule to show cause, the finding was sustained by this court, and final judgment thereon was entered. *Titus & Scudder* v. *Cairo and Fulton R. R. Co.*, 8 *Vroom* 98. A new trial was obtained by means of proceedings in the

Court of Chancery, which appear in the report of the equity case in 12 *C. E. Green* 102 ; 1 *Stew. Eq.* 269 ; 3 *Id.* 502 ; 4 *Id.* 397 ; 8 *Id.* 384. The suit was again tried at the Hudson Circuit, May Term, 1883, and resulted in a verdict in favor of the plaintiffs for damages, $25,000. A rule to show cause was granted, and the case is now here on a hearing upon that rule.

Argued at June Term, 1884, before BEASLEY, CHIEF JUSTICE, and Justices DEPUE, SCUDDER and REED.

For the rule, *T. N. McCarter.*

*Contra, Cortlandt Parker.*

The opinion of the court was delivered by

DEPUE, J. That Titus & Scudder concluded a contract for the purchase of the company's bonds to the amount named is not disputed. The contract was made with Guthrie, and the point of contestation is whether the contract of purchase was upon terms expressed in the agreement in writing signed by Guthrie and dated February 15th, 1868, and in the two orders and acceptances of the dates respectively of April 6th and June 1st, 1868, or whether the purchase was under a contract made by Guthrie as agent of the company for an unconditional sale and delivery of the bonds.

At this trial, Guthrie's agreement of February 15th, 1868 —the non-production of which at the former trial was made the ground of the proceedings in chancery—was produced and put in evidence, together with other important papers not in evidence on the first trial. By these means, and the examination of additional witnesses, and the thorough investigation that was made of transactions connected with the subject matter of the litigation, some matters were made plain that at the first trial seemed doubtful or obscure.

The resolution of the board of directors of November 2d, 1859, was never rescinded, and I think it is clear that under

that delegation of authority Brayman had power to make sale and disposition of the company's bonds, and that his contracts in that respect would be good as in favor of persons who were *bona fide* holders. *Hackensack Water Co.* v. *De Kay*, 9 *Stew. Eq.* 548; *Moores* v. *Citizens' Nat. Bank*, 111 *U. S.* 156, 169.

It is also plain that Guthrie had no power to make such a contract as is in question in behalf of the company under the authority of Brayman's letter of May 18th, 1866. What his powers were under the circular letter of October 17th, 1866, will hereafter be considered. The inquiry at this time will be, In what capacity did Guthrie act in making the contract and the terms of the contract entered into ?

The situation of affairs at the time Titus & Scudder negotiated their purchase was this : Potts and Guthrie, under the construction contract, were entitled to the bonds of the company to the amount of $23,000 per mile. Their right to these bonds, either in the whole or in instalments, was conditioned upon their construction of the road according to the terms of the contract. Guthrie, as an individual, had, in virtue of the contract between him and Potts, a right to a certain number of these bonds, in the proportion of $3000 for each mile of railroad constructed by them. His right to any bonds was also dependent on the construction of the railroad. Potts and Guthrie also had a right to have an advance to them of bonds before the payments came due under the contract, on satisfactory security being given therefor.

Guthrie and Titus were the only witnesses sworn at the first trial. They both testified that the contract between Guthrie and the plaintiffs was a general one, and that it had no connection with the contract between Potts and Guthrie; that it was an absolute undertaking by Guthrie, as agent of the company, to deliver within a reasonable time the twenty-five bonds for the consideration of $5000, subject to no condition or contingency whatever; and that, after the purchase money had been paid and the parol agreement of purchase was completed, Guthrie, without the knowledge or suggestion of the plaintiffs,

·drew the two drafts, sent them to Brayman, who endorsed his acceptances and forwarded them by mail to the plaintiffs. This court on the former hearing, on this presentation of facts, held that the drafts as accepted engrafted upon the original contract new terms by which the defendants' obligation to perform their part of the bargain, which before that was absolute and unconditional, was made to depend upon the performance of a contract between other parties, over which the plaintiffs had no control, nor even knowledge of its contents, and that there being no consideration for this new contract, it could not operate to engraft new terms upon an existing contract for the want of consideration. *Titus & Scudder* v. *Cairo and Fulton R. R. Co.*, 8 *Vroom* 98. This statement of the grounds of the former decision exhibits the importance of the agreement between Guthrie and Titus & Scudder of February 15th, 1868, and of the evidence touching their connection with that agreement.

I will examine the evidence on that subject, and, in the same connection, consider what the evidence is with respect to the actual contract between the parties; for, important as that agreement is as an instrument of evidence, the question at issue cannot be elucidated without taking into account all the evidence concerning the contract which was in fact concluded.

There is no satisfactory evidence as to the precise time when the Guthrie agreement and the Potts guaranty were executed other than the date those papers bear. The $5000 was paid in payments—Titus said four or five payments. The first payment was $1000; the residue, he said, was paid in two or three instalments. Potts, who saw the $1000 paid, said that no writing was drawn, signed or delivered when that money was paid. Scudder's recollection is that as the money was paid receipts were given which were surrendered when they received the vouchers, and that the Guthrie agreement came to them with the first acceptance. I do not consider it of much importance when or how the agreement was forwarded. The question is whether it was a memorial of the actual contract of purchase, or simply collateral to the contract.

The agreement on its face imports an agreement between the parties. Undue stress was laid upon the fact that it appears signed by Guthrie only. Mr. Scudder's testimony furnishes ample explanation for that condition of the agreement. The agreement comprised two classes of undertakings—the one by Titus & Scudder for the payment of the money in instalments, the other by Guthrie for the delivery of accepted orders for the bonds and for refunding the $5000 with interest in case the bonds should not be delivered within one year from the succeeding 1st day of May. When Titus & Scudder paid all the money they had performed all their undertakings. Nothing remained to be effected by the agreement but Guthrie's personal guaranty for the issuing of the bonds in conformity with the orders, and Guthrie's signature to the agree·ment was all that was necessary to make the agreement effective in that respect. It would be natural for Titus & Scudder not to sign the agreement when they had done all they were required to do under it.

The witnesses having personal knowledge of the transaction were Guthrie, Potts, Titus and Scudder. Of these witnesses, all, with the exception of Scudder, were dead at the time of this trial. Guthrie's testimony was read from his examination at the first trial, Potts' from his examination in the chancery suit, Titus' from his examination at the former trial and also in the chancery suit. Scudder alone was present and examined as a witness in this trial. These witnesses were all persons of intelligence, and each had had considerable experience in business. From their intelligence and business experience it must be assumed that they possessed adequate knowledge of the mode of transacting business and the capacity to understand the import of the papers that passed.

It will be observed at the outset that the plaintiffs' letter to Brayman of February 6th, 1868, contained no intimation of a purpose to deal in any way with the company for the purchase of its bonds. The first knowledge Brayman, the president, had of the transaction was on the 6th of April, 1868, when the first order was sent to him for acceptance. It

will also be remarked that Brayman's answer of February 10th—which came to hand before the contract was closed, and before any money was paid, and was not in evidence at the former trial—informed the plaintiffs that J. C. Potts & Co. were the contractors for the one hundred and sixty-one miles of road under contract, and that no bonds of the company were in the market, and also that it was a matter of probability or expectancy only whether the company's financial arrangements would be made through that firm. The testimony must be considered and adjudged upon in the light of the plaintiffs' dealing with Guthrie with knowledge of these facts.

Guthrie's testimony at the former trial was that he was the financial agent and general representative of the company in New York; that as such financial agent he had a transaction with Titus & Scudder in the way of raising money for the benefit of the road, which resulted in his agreeing to sell to them twenty-five of the company's land-grant bonds, to be delivered upon the issuing of such bonds; that this agreement had nothing whatever to do with the agreement between him and Potts; that the orders were drawn in the form in which they were expressed to avoid an acknowledgment that the company was selling its bonds at that price, and to show that he, the witness, as an individual, took the responsibility of selling the bonds though it was for the company, and that the orders were so worded without consultation with Titus or any one else, and that the orders did not refer to the real bargain between him and Titus for prudential reasons—for the interests of the company.

I state Guthrie's testimony at this time without comment. It was this evidence that induced the court on the former occasion to sustain the verdict the plaintiffs had obtained. The force and effect of this testimony, and the degree of credit to be given to the witness, will presently be considered.

The testimony of Mr. Potts on this subject is quite uncertain in its character. It is true that he said at the outset of his examination that "he had knowledge of the original transaction which gave rise to these papers," but he did not profess

to have his knowledge from his participation in or presence at the negotiation. He testified that he was present in the office at the time of the contract between Titus & Scudder and Guthrie, but he says that he took no part in the negotiations; that he knew something of what was going on by their conversations, but that he took no part until its close, when he was asked if he would guarantee the bonds. He was asked whether he heard the bargain when it was concluded, and replied that he supposed he did, but his memory did not serve him as to what might have been said. He was further asked whether he could state, from present recollection of what he heard of their bargain, what their conversation was by which the bargain was effected, and replied that he could not repeat any portion of the conversation. This is Mr. Potts' own account of what he personally knew of the transaction as it occurred. It was not such knowledge as would enable him to testify to the terms of the contract. He was then asked the question, "From whom and when did you *first* learn what the terms of the bargain were between Guthrie, Titus and Scudder?" to which he replied, "I suppose I learned from both of them concurrently, or nearly so, as the transaction was passing and matured." He was then asked, "What did you *then* understand the bargain to be?" His reply was, "that Guthrie, as the agent of the company, sold to Titus & Scudder twenty-five of the first mortgage land-grant bonds, $1000 each, to be delivered in the future, and for the delivery of which he was to give them the acceptances of General Brayman, who was the president of the company, for the sum of $5000, to be paid by Titus & Scudder in instalments, as was designated."

This is the whole of Mr. Potts' testimony on this point. From it it is manifest that if his means of knowledge were not imperfect, his memory at the time of his examination as a witness was at fault. Against Mr. Potts' recollection of the understanding of the parties may be placed his acts in connection with the prosecution of the plaintiffs' claim. In April, 1871, he was employed by Titus & Scudder, as counsel, to

bring this suit, and the Guthrie agreement and the two acceptances were placed in his hands as the evidence of their claim. The negotiations then on foot by Marquand and others for a re-organization of the company under a new management, were about concluded. A compromise had been effected with Potts for the surrender by him of one thousand of the company's bonds, and when that was concluded by Mr. Ashbel Green as counsel for Marquand, Potts says that he then said to Mr. Green, "Mr. Marquand is going into this matter, and there is another claim he ought to know about—that of Titus & Scudder, of Trenton;" that Green inquired what it was, and he (Potts) said, "I will show you," and procured from his safe the three papers—the Guthrie agreement and the two acceptances—and handed them to Mr. Green; that Mr. Green examined them and inquired what it could be settled for; that he (Potts) replied, for $5000 and interest; that Green then asked him (Potts) to make the calculation and drop him a line, that he might lay it before Marquand. The outcome of this interview was a letter written by Potts to Green, of September 26th, 1871, in which he says, "The claim of Titus & Scudder against Dr. Guthrie amounts to—principal and interest, due September 30th, 1871—six thousand two hundred and seven dollars and fifty-two cents ($6207.52), for which they have the acceptances of the Cairo and Fulton Railroad Company, by Mason Brayman, president, for twenty-five bonds, first mortgage land-grant, each $1000."

The force of this letter is not explained away by the fact that it was an offer of compromise. Its significance lies in the fact that Mr. Potts, who was a lawyer of considerable experience, and who knew, from what the parties had told him, what the bargain was, made no claim of any collateral contract of the company, independent of the acceptances, and that he represented it to be the claim of Titus & Scudder against Guthrie, for which they held the president's acceptances.

No compromise having been effected, Potts, as counsel of Titus & Scudder, brought this suit, his firm, Potts & Linn, being the attorneys. The declaration filed contained four

counts, each being upon the acceptances. On demand of the defendant's attorney, a bill of particulars was furnished, containing the two orders and acceptances as the particulars of the plaintiffs' cause of action. Demurrers having been filed to the declaration, the pleading was amended by adding two counts alleging contracts with the defendant. A new demand for particulars was made, and the same bill of particulars was furnished. There does not appear to have been any information or knowledge on the part of Potts of any contract with the company, other than the acceptances, until the consultation with Guthrie in August, 1872, preparatory to the trial, which will presently be referred to. Potts says that he was not present at that interview, but learned "immediately after, that from the statements made by Guthrie and Titus it was better to add a further count declaring upon a direct contract of sale by the company of the bonds, and to rely at the trial upon that."

The testimony of Mr. Potts as a whole gives but a slender support for the plaintiffs' case. Taking into account his inattention to or imperfect recollection of the conversation at the time of the negotiations, his letter to Mr. Green, and the bills of particulars he furnished, the weight of his testimony is the other way. If he knew what was actually agreed upon, his acts, which are always most reliable indications, gave unmistakable evidence that the contract was with Guthrie, and that the only liability of the company was upon the terms of the acceptances.

I come now to the testimony of the plaintiffs. The $5000, as already mentioned, was paid in instalments. For these payments Mr. Titus had no recollection of getting any voucher. Mr. Scudder says that they got receipts; that those receipts were given up to Guthrie when they received the vouchers (the Guthrie agreement and the acceptances); that "when we received the vouchers we had no further use for the receipts." Titus said that he was induced to receive and hold the acceptances because he expected they were proper vouchers for the forthcoming of the bonds. He said also, "When we got the

orders I supposed we had the proper vouchers." In answer to the question, "State precisely what you were to have as vouchers until the bonds were issued?" he said, "I suppose we were to have just what we received—the acceptances of the company; but I can't remember anything definite about that." Mr. Scudder is more explicit. He says they received the acceptances and the Guthrie agreement, and surrendered the receipts, and put the papers in the safe, and held them as vouchers for the forthcoming of the bonds, as the evidence of that which they had a right to expect. The testimony of the plaintiffs leaves no doubt on the subject that the acceptances were accepted and received as the consummation of their contract to purchase. They had no other written evidence of their right to property of the value of nearly $20,000. Fraud or imposition upon them is out of the question. They were intelligent gentlemen of large business experience. They had notice by Brayman's letter of February 10th, 1868, that there was a contract of the company with Potts & Co. The orders are plainly expressed on their faces, and they both admit that they knew the contents of the orders and acceptances. The bonds not having been delivered on demand, the plaintiffs determined to bring suit against the company, and employed Mr. Potts as their attorney. They delivered to Mr. Potts the Guthrie agreement and the two acceptances as vouchers for their demands against the company.

The acts of the plaintiffs here mentioned are consistent only with the theory that the plaintiffs' contract to purchase was a contract with Guthrie personally, the company's liability being on the acceptances only, and their acts were of such character and weight as to furnish the most cogent, if not conclusive, proof that the contract for the bonds was Guthrie's individual contract, and was performed when he delivered the acceptances. There is not in the acts or doings of the plaintiffs any indication of their recognition of any other contract with the company than that expressed in the acceptances until there was a "state of facts revealed by Guthrie" at the conference of August, 1872. Mr. Scudder, in answer to the question

whether, prior to that interview, the plaintiffs did set up or assert any claim against the company except upon the acceptances, says, " I don't know that we did, prior to that."

This conference was held on the 20th of August, 1872. Additional counsel had been called in, and an interview was had with Guthrie to prepare for the coming trial. Guthrie and Scudder, and Titus probably, were present at that interview.

The plaintiffs' account of the occurrences at that interview, I prefer, at the hazard of prolixity, to take from their answer in the chancery suit. They were defendants in that suit, and their answer was filed by Potts as their solicitor. They say that preparatory to the trial an interview was had with Guthrie, and careful and close inquiry was made of him " as to the circumstances under which the said $5000 was advanced and the contract for said bonds was made, and also as to the character and terms of said contract; " that the information given by Guthrie was " that he was early a director of the Cairo and Fulton Railroad Company, and had for three or four years prior to October, one thousand eight hundred and sixty-six, acted by verbal agreement with and for the said company, with full power as financial agent and general representative of the company's interests at Washington city; that in October, one thousand eight hundred and sixty-six, he had received written authority from the company to represent it as such financial agent and general representative in New York city, which authority was of the tenor and effect following, that is to say : [Setting out the circular letter of October 17th, 1866.]

" That he accepted the position and entered on the duties of said office, having a place of business in Cedar street, afterwards in Broadway, New York; that as such financial agent he had, during the fall of 1867 and winter of 1868, negotiations with the defendants, which resulted in his agreeing to sell them, on account of said company, twenty-five land-grant, first-mortgage bonds, each of one thousand dollars, for the sum of five thousand dollars, to be paid by these defendants; that

the five thousand dollars had been paid by them to him for said company and applied to its use; that the sale had been by and for said company; that to avoid the necessity of acknowledging that the Cairo and Fulton Railroad Company was selling its bonds at so low a price, he had, with the knowledge and consent of the president of said company, who possessed the right of management thereof, adopted the form of himself contracting as an individual for the selling said bonds and of giving orders upon the company for their delivery, as set out in said bill of complaint, which said company, by their president, accepted as therein stated, but that the contract was wholly a company transaction, and was in reality no contract of said Guthrie with these defendants; that it was true there had been a formal contract between said Guthrie and Joseph C. Potts, of the date of June twentieth, one thousand eight hundred and sixty-seven, approved by the president of said company, as stated in said acceptances, but that no such contract existed when the second of said two acceptances was made, and *that it was abrogated by said company* and all parties concerned as early as the first day of May, one thousand eight hundred and sixty-eight, and without any knowledge or consent of said defendants, so that in any event said company were liable to deliver said bonds to said defendants, having put it out of their power to obtain the same under the contract mentioned in said acceptances; and further, that said company having given up the idea of issuing said bonds orignally contemplated, and to issue gold bonds instead, had agreed, in consideration of the premises, to deliver to said defendants twenty-five of said gold bonds instead of those named in the said acceptance.

"That upon such conference, the said counsel of said defendants determined upon applying to the court again to amend their declaration, in order so to frame the same as to meet the *state of facts revealed by said Guthrie,* whose knowledge upon said subject they knew was greater and more exact than that possessed by any other person, and thereupon said

amendment by the addition of a count was made as set forth in said bill of complaint."

The plaintiffs also in their answer, to rebut the charge of fraud in withholding the Guthrie agreement at the first trial, said, " That a very long time had elapsed since they advanced their said moneys and made their contracts with said company through the said Guthrie for the purchase of said bonds ; that the details of the transaction had passed, to a great extent, from the memory of either of them ; that they had long before given all the papers they ever had relating to the matter to their counsel aforesaid, Joseph C. Potts, esquire, to use for their benefit in collecting their claim against the said company, and had nothing whereby to refresh their memory of the matter, and that knowing that said Guthrie possessed complete knowledge of the subject, and *hearing from him* as aforesaid, as said Titus did, his account of the transaction, *that his contract with them was really not in his own right or on his own behalf at all, but as agent and on behalf of said company, that he had full authority so to contract, and that his motive in the giving said drafts or orders and arranging for their acceptance said by Brayman, as president and financial agent of said company, was the preservation of the credit of said company as aforesaid, these defendants rested implicitly upon his account of the transaction and neither had then, since, nor have they now any doubt of its correctness.*"

These extracts from the plaintiffs' answer in the chancery suit are the plaintiffs' admission that the details of the transaction had, in a great measure, passed from their memory.—a circumstance of itself of considerable probative force where business men are setting up a verbal contract, and for property of large value, inconsistent with written documents in their possession—and also show that their present understanding of the transaction is the product rather of their belief in Guthrie's statements than of their own recollection of the actual events. Indeed, with the exception of simply affirmative responses made by Titus at the first trial, to leading questions of their counsel, there is nothing in the testimony of

these witnesses irreconcilable with the writings in their possession, and much that sustains the defendant's view of the transaction. They both testify that they knew the contents of the orders and acceptances, and that they were such as they supposed they were to have and had a right to expect under their contract. Mr. Scudder said that when they made the contract he knew it was part of the condition that the issue of the bonds they expected to get depended on the construction of the road. The evidence of these witnesses shows that the contract was not an absolute, unqualified and unconditional agreement for the sale of the company's bonds; and if the contract was conditional, and subject to the conditions expressed in the orders and acceptances, it is practically of little consequence whether it was the contract of Guthrie individually or by him as agent of the company.

It is evident that the plaintiffs' case with respect to the terms of the contract to purchase, has its foundation upon Guthrie's testimony. This court sustained the former verdict on the theory that the original contract was an absolute undertaking to deliver the twenty-five bonds, without any connection with the contract between Potts and Guthrie, and subject to no condition or uncertainty whatever, and that the orders and acceptances engrafted upon the original contract new terms. This view has little or no support except by Guthrie's testimony.

Guthrie was a witness directly interested in the result of this suit, in order to relieve himself from liability on his guaranty to repay the $5000 in the event of the plaintiffs not receiving the bonds or an equivalent from the company. He stands before the court as an interested witness, testifying in behalf of his own interest. He gave his testimony in 1873, five years after the transaction to which it related. His attention was not then called to his written agreement of February 15th, 1868, nor to his letters to Brayman of March 26th, April 6th, and June 1st, 1868, nor to Brayman's letter of April 14th, 1868, returning the first order accepted. These letters furnish means for estimating either the correctness of Guthrie's testimony or his standard of integrity. They are a contempo-

raneous record of the events as they occurred, and were private letters between persons as between whom there was then no motive to falsify or give color to the transactions to which they related. In his letter of March 26th, 1868, written from Washington city, Guthrie said, " I raised some money for the campaign *by selling a small interest (of my own) in our bonds,. prospectively, last week.*" That this paragraph referred to the sale to Titus & Scudder is shown by Guthrie's letter to Brayman of April 6th, 1868, enclosing the first of these orders for acceptance. Brayman returned this order with his acceptance in a letter to Guthrie dated April 14th, 1868, in which he said, " I enclose as requested *your* order for fifteen $1000 bonds of the C. & F. Railroad Company, accepted. *Mr. Titus understands, of course, upon what contingencies and terms the bonds are issuable.*" In his letter of June 1st, 1868, enclosing the second order for acceptance, Guthrie said, " I enclose another order for signature or acceptance. *I* sold to these parties twenty-five bonds, and this is for the remaining ten."

The statement of the transaction given by Guthrie in his letter of March 26th, is in direct contradiction with his testimony. In his letter he says that he made sale of *his interest in the bonds ;* in his testimony he says the sale was by him, as agent of the company, of *its* bonds, without any condition or connection with his interest under the Potts contract. One or the other of these statements is untrue. On the assumption that Guthrie was a man of integrity, there should be no hesitation in accepting his statement given in a letter written while the transaction was *in fieri,* and part and parcel of it, in preference to his account of the transaction given after an interval of five years had elapsed. Again, Brayman's letter of April 14th, returning the first order accepted, proves that he never consented to a sale of the bonds except on the terms and conditions upon which they were issuable, and effectually puts an end to the idea that he was a party to any scheme for surreptitiously substituting a conditional contract in the place of one that was absolute. This correspondence took place before the transaction was concluded and before either of the accept-

ances was delivered.  Guthrie, on the receipt of Brayman's letter, was under an obligation to disclose to Titus & Scudder the terms and conditions on which the company consented that the bonds should be issuable, if he had not done so before. If he made the communication, the duty of Titus & Scudder was to rescind the contract if it was not according to the agreement, or abide the consequences ; and if Guthrie withheld this information and induced the plaintiffs to accept these papers by representing that they were a device of the company to cover up a sale by the company of its bonds, he was guilty of a fraud of such a dye as would destroy his credit as a witness.

The Guthrie agreement of February 15th is expressed in clear and explicit language.  Guthrie had a contingent interest in the bonds to be issued under the contract of Potts & Co., which he might dispose of.  The agreement, therefore, was one capable of being executed.  Orders and acceptances in conformity with the terms of the agreement were obtained and forwarded to the plaintiffs, the receipts for the money paid were surrendered, and the agreement and acceptances were held as vouchers.  The parties *acted* under the Guthrie agreement. The acceptance by the plaintiffs of this agreement, intelligible on its face, explicit in its language, applicable to the subject matter of the contract, and executed by the delivery of acceptances in conformity with its terms, affords the most cogent proof that it expressed the real terms of the contract between the parties.  The evidence to overcome the probative force of these circumstances, and to displace this written agreement and set up in its stead a verbal understanding inconsistent with it, must be clear and in the highest degree satisfactory, and come from sources free from suspicion of bias or unfairness.  Such proof has not been produced.  On the contrary, the decided weight of the evidence—by the papers themselves and the acts and conduct of the parties—is to sustain this agreement as expressing accurately and fully the real contract that was concluded.

Furthermore, if the oral testimony had established that

Guthrie's contract with Titus & Scudder was a general contract made by him as agent of the company, we think it would not avail the plaintiffs, for want of the power in Guthrie to make such a contract to be binding upon the company. The power to bind the company by a contract of this nature must be derived from the board of directors; it could not be conferred by the president unless the president was expressly authorized to make such a delegation of authority, so that it was in effect a power granted by the directors. For this familiar rule of law I need only refer to this case as reported in 8 *Vroom* 98. Guthrie testified at the former trial that a power of attorney to him, similar to the circular letter of October 17th, 1866, was entered on the company's books, and that, by a resolution of the board, Brayman had general charge of all the affairs of the company in connection with himself (Guthrie), or separate from himself if he chose to act. No such entry or resolution appears. The only power to sell and dispose of the company's bonds appearing in the minutes is that conferred by the resolution of November 2d, 1859, and that is conferred upon the president in person, without any authority in him to delegate the power to another. The charge of the trial judge that "it is a maxim of the law that delegated power cannot be delegated; the delegate cannot delegate; he may use others in the accomplishment of particular transactions which he directs, but he cannot grant to the discretion of others that which was entrusted to his discretion," was correct as applied to this case. Except where a known usage of trade justifies, or necessity requires, the employment of subagents, an agent whose powers and duties involve personal trust and confidence and the exercise of judgment and discretion, cannot, without authority from his principal, delegate to another the confidence and discretion reposed in him. Having, by his own judgment and discretion, determined what should be done, he may authorize another to perform the ministerial acts necessary to carry into effect the purposes of his employment, but he cannot turn his principal's business over to the judgment and discretion of another, and

bind the principal by the acts and conduct of the latter. 1 *Sugd. on Powers* 214; *Story on Agency*, § 14; 2 *Kent* 633; 1 *Chitty on Contracts* 296 *and note; Commercial Bank* v. *Norton*, 1 *Hill* 501; *Lewis* v. *Ingersoll*, 1 *Keyes* 347; *Brewster* v. *Hobart*, 15 *Pick.* 302, 308.

The only appointment as agent that Guthrie had was the circular letter of October 17th, 1866. That appointment purports to have been made by the president in virtue of authority vested in him as president, and not by the board of directors. It designates Guthrie as general financial agent of the company in New York, and defines his authority to be "to secure stock subscriptions and receipt for payments; to negotiate loans; to arrange contracts for construction and equipment; to incur and adjust expenses, and in general to take care of the interests and affairs of the company in the city of New York." This power of attorney contains an enumeration of the special powers of Guthrie as agent, which did not include the power to make executory contracts for the sale of the company's bonds, and such a power will not be implied from the general words, "to take care of the interests and affairs of the company." I find no evidence of Guthrie's authority even under Brayman to contract for the issue of bonds, except that implied from Brayman's letters of April 14th, 1868, and June 9th, 1868. The last of these letters had no reference to a contract such as this; it related to a hypothecation of bonds, as appears by Guthrie's letter of June 1st, to which Brayman's letter of June 9th was an answer, and the authority to be implied from Brayman's letter of April 14th, 1868, was special, to dispose of the bonds on the terms and conditions on which they were to be issuable. Aside from the fact that Guthrie had no power from the board of directors to contract for the issuing of bonds, he had not the consent of Brayman to contract for these bonds except on the terms upon which they were issuable, as expressed in the orders and acceptances; and any contract Guthrie might make for the issue of bonds otherwise was in fact not only without authority from the directors, but was also without the consent of Brayman, so as to make

his agreement the act of Brayman. And Titus & Scudder had notice pending the negotiation, by Brayman's letter of February 10th, 1868, that the company's bonds were not then in the market, and would not be until ready to be placed for means to build the railroad, and that its financial arrangement through Potts & Co. was only a matter of expectancy in the future. With this information the plaintiffs were not in law *bona fide* purchasers, and are not, for that reason, entitled to stand on any authority the agent assumed to have. *Hackensack Water Co.* v. *De Kay*, 9 *Stew. Eq.* 548 ; *Moores* v. *Citizens' National Bank*, 111 *U. S.* 156, 169. If Guthrie misrepresented his authority, and perpetrated a fraud on the plaintiffs, the president of the company was no participant in that fraud, and if the company received the avails of the fraud, the plaintiffs' remedy against the company would be, not for damages, but by way of rescission of the contract and the recovery back of the consideration paid. *Kennedy* v. *McKay*, 14 *Vroom* 288. Nor can the plaintiffs hold their contract as against the company on the ground of a subsequent ratification of the unauthorized act of the agent ; for knowledge by the principal of the unauthorized act of the agent is essential to a ratification, and as soon as the company or its officers were made aware of Guthrie's act, they promptly repudiated it. *Gulick* v. *Grover*, 4 *Vroom* 463.

The remaining question is whether the plaintiffs have shown a cause of action against the company upon the acceptances. The agreement to substitute gold bonds instead of the currency bonds contemplated when the orders were given, was in no sense a new contract. It had neither the form nor the necessary consideration of a new and independent contract. The gold bonds, as remarked by the trial judge, were merely a substitution for the currency bonds, and the plaintiffs' right to the gold bonds rested upon the same grounds on which their right to the currency bonds rested—upon the terms and conditions expressed in the orders.

The contract of the company in the acceptances being for the delivery of the bonds upon a contingency, the plaintiffs, to

recover on it, must show that the contingency happened, or that performance of it was prevented by the act of the company. *Hudson* v. *Bilton*, 6 *E. & B.* 565; *Hinds* v. *Henry*, 7 *Vroom* 328. No work was done by Potts and Guthrie under their construction contract, and they earned no bonds under their contract. The plaintiffs contended at the trial, and insisted here, that the contingency on which they were entitled to have their bonds had occurred in the fact that the company issued to Potts and Guthrie fifteen hundred of their bonds. The facts on which this contention rests are not disputed. Mr. Potts said that on the 25th of September, 1868, Brayman delivered to him one thousand of these bonds as an advance upon the contract, and as evidence of the fact he produced a letter of that date from Brayman in which he said, "In accordance with our construction contracts, I herewith deliver bonds of this company from one to one thousand inclusive ($1,000,000) being the first and only issue upon the $5,000,000 authorized." In October, 1868, Brayman handed over five hundred more bonds, which Potts says were delivered to Guthrie, who took them in his keeping. For these bonds a receipt, dated October 28th, 1868, was produced, signed by Potts and Guthrie, stating that they were "an advance upon our contract for construction of said railroad, and our supplemental contract, dated respectively June 20th, 1867, and May 1st, 1868, as provided in section 5 of said original contract, being in aggregate for five hundred thousand dollars, the coupons due November 1st, 1868, to be severed and redelivered to said company without charge."

Potts says these bonds were given to him in pursuance of a clause (section 5) in the construction contract, and for the purpose of facilitating his negotiations in disposing of the contract. He adds, "If I presented this matter, for instance to Mr. Opdyke, I can say, 'I have got $1,000,000 of these bonds which I can turn over to you if you become the purchaser.' I am stating now how I received them rather than how they were given. There was no limit to my authority other than was in the letter. It gave me, I thought, a larger control, and

added weight, I thought, to my negotiations." The one thousand bonds Potts received he deposited with the Safe Deposit Company, and afterward with the International Trust Company, and they were the same bonds he surrendered to Deckla in 1871.

Of the five hundred bonds given to Guthrie, two hundred and forty-two came to Brayman's possession, for which he gave an indemnity, signed by him as an individual, dated October 28th, 1868, whereby he agreed with J. C. Potts & Co., and the Cairo and Fulton Railroad Company, to indemnify and save them harmless from the payment of the interest coupons on the bonds of the company, which he (Brayman) received of this issue.

What became of the other two hundred and thirty-eight bonds does not clearly appear, except that those not hypothecated were seized by the sheriff under an attachment against the company. The testimony shows that these five hundred bonds were issued for the purposes of hypothecation. Brayman says that they were " the subject of convenience—passed backwards and forwards one to another. I had part of them part of the time, hypothecated; sometimes they went back to them again, and then to me again."

It appears in the case that Brayman was interested from the beginning with Potts and Guthrie in their construction contract to the extent of one-third of the profits, and that his interest was not known to the company or to any of its officers. Brayman's interest in the construction contract was in itself a fraud upon the company, and in direct violation of section 27 of the charter, which declares that " no member of the board of directors, agents, officers or servants of the company shall be directly or indirectly interested in any contract for work."

The construction contract provided for the delivery of bonds in advance of payments for work done, " for the purpose of providing means for the more rapid progress of the work " than was therein provided. These bonds were not delivered for that purpose; they were delivered to Potts and Guthrie to facilitate negotiations for the sale of the contract for the

personal emolument of Brayman, Potts and Guthrie. The contract provided that the bonds so to be advanced should be delivered "on satisfactory security being given therefor." These bonds were delivered to Potts and Guthrie without any security whatever.

The delivery of these bonds was not a delivery of bonds under section 5 of the construction contract. Brayman's act in delivering them was nothing else than a fraud upon the company, and the company could have brought suit and recovered the bonds back from Potts and Guthrie as property of the company illegally obtained. Negotiated, and in the hands of *bona fide* holders for value, on principles of commercial law applicable to negotiable paper, the bonds would have been valid and binding securities. The plaintiffs are not in that position. They advanced no money on these bonds in the market as negotiable securities. They are merely seeking to make this act of Brayman performance of the condition expressed in the acceptances. To succeed in that they must show that his act was the act of the company, and that the bonds were in fact delivered in compliance with the terms of the construction contract. But if these bonds were lawfully delivered in compliance with section 5 of the construction contract, their delivery was not such as to be compliance with the condition in these acceptances. The personal contract between Potts and Guthrie of June 20th, 1867, made no provision for any interest of Guthrie in bonds delivered in advance of payments for work done. By its terms, Guthrie was to have land-grant bonds to the amount of $3000 "for every mile of said railroad constructed and paid for" under the construction contract of Potts and Guthrie of June 20th, 1867, and by the latter contract the work was to be done in sections, and the bonds and stock to be delivered as payments therefor were to be payable on the completion of each twenty miles of the road. If Potts and Guthrie, either themselves or in connection with B. C. Potts, who was afterward admitted into the firm of Joseph C. Potts & Co., had done work in the construction of the road contemplated by the construction contract of June

20th, 1867, so that Guthrie would have been entitled to bonds under the personal contract between him and Potts, then Titus & Scudder would have been entitled, under the orders and acceptances, to those bonds, and the company could not set up these advances to Potts and Guthrie to defeat the plaintiffs' rights. But that contingency never happened, and Guthrie never became entitled to any bonds under the personal contract between him and Potts. In neither of these aspects were the fifteen hundred bonds delivered to Potts and Guthrie in September and October, 1868, an issue of bonds such as is mentioned in the orders and acceptances.

The plaintiffs also contend that they are entitled to this verdict on the ground of a rescission of the contract mentioned in the acceptances, whereby the performance of the condition was defeated. The measure of damages for such an act, if wrongful, would be the value of the bonds of which the plaintiffs were deprived, and interest. It becomes, therefore, the important question in this case whether the plaintiffs' right to recover can be sustained on that ground.

It will be observed that the company, by these acceptances, did not enter into an absolute undertaking to issue the bonds contracted for. Though the form of the acceptances was not the same upon both orders, their legal effect, as the trial judge held, was the same, and the company's contract in both cases was to deliver to the plaintiffs bonds which were issuable under the personal contract between Potts and Guthrie. That contract was incorporated into the orders and acceptances, and the right of Guthrie to have the bonds under that contract was the condition upon which the company agreed to issue the bonds to the plaintiffs.

Guthrie testified at the first trial that the contract referred to in the orders—that is, the personal contract between Potts and Guthrie—had been abrogated. In fact, the contract appears to have been canceled by having the names of Potts and Guthrie erased and the seals cut off. This cancellation was effected in May, 1868, when Benjamin C. Potts was taken into the firm of Joseph C. Potts & Co. This contract was

the personal contract of Potts and Guthrie, in which the company had no interest and over which it had no control. Its cancellation was the act of Potts and Guthrie, in conformity to their personal arrangements for bringing a new member into their firm. It was done without any consent obtained from Brayman or the company, and Potts and Guthrie could lawfully have canceled the contract against the objections of the company. The cancellation would have been inefficacious as against Titus & Scudder if Guthrie's right to the bonds had been earned by work done under the construction contract, but the cancellation of the personal contract of Potts and Guthrie cannot of itself be made a ground of recovery against the company. A rescission of the construction contract of the company with Potts and Guthrie, whereby Guthrie's right to bonds under his personal contract with Potts was defeated, is therefore the foundation of the plaintiffs' right to a recovery on the ground of a rescission, and to make that rescission efficacious to the plaintiffs' action it must appear that the rescission was wrongful and without legal justification, for it is the settled doctrine of the law that damages cannot be recovered for every species of loss that an individual has sustained by the act of another. There must not only be loss, but the loss must be injuriously brought about by a violation of the plaintiffs' legal rights. There must be a wrongful act done by the defendant and a loss resulting from that wrongful act. *Sedg. Dam.* [30], 27, [31], 28; *Warwick* v. *Hutchinson,* 16 *Vroom* 61, 65.

The construction contract of Potts and Guthrie with the company, in section 6, provided that the contract might be modified by the parties. On the 1st day of May, 1868, a contract was made under seal between Potts and Guthrie and the company, which is stated in it to be supplemental and in addition to the contract of June 20th, 1867, and was declared to be part and parcel of the latter contract. This contract contained three clauses—the first extending the time for the completion of the first twenty miles of the road until the 1st day of May, 1869; the second, enlarging the work contracted

for so as to include the whole line of railroad from Missouri to the Texas boundary; the third, providing that if a bill before congress, granting aid to the company, was passed, the amount of bonds of the company to be paid to the contractors should not exceed $16,000 per mile, and sufficient bonds of the United States should be paid, in lieu thereof, to make up the sum of $23,000 per mile, in bonds. These provisions were manifestly no rescission of the contract of June 20th, 1867, and were advantageous to Potts and Guthrie in that it saved a forfeiture of the contract for the non-completion of twenty miles of road before the 1st day of January, 1869, as stipulated for in the original contract. An amendment of these contracts was made by another supplemental contract, executed October 28th, 1868. This last-mentioned contract made no material alterations in the preceding contracts. It simply changed the width of the gauge of the track, and the reference to the date of the act of the legislature under which the state bonds were to be issued, and provided that Potts and Guthrie, in lieu of paying interest on bonds advanced to them, before payments for work became due, as specified in the contract, should surrender the coupons on said bonds to those periods.

The 1st day of May, 1869—the day fixed by the supplemental contract of May 1st, 1868, for the completion of the first twenty miles of the road—came, and Potts and Guthrie had neither done nor made any preparation to do any work in the construction of a railroad. In March, 1869, Potts went to England to endeavor to make sale of the contract. He returned in May with a contract bearing date May 25th, 1869, and purporting to be between Joseph C. Potts, Benjamin C. Potts and Columbus B. Guthrie, of the first part, and Edmund Carlisle and Charles Cave Williams, of the second part, and the Cairo and Fulton Railroad Company, of the third part. This contract provided for the transfer and assignment of the construction contract, and for putting Carlisle and Williams in possession of a majority of the capital stock of the company, and placing them in the exclusive control, direction and management of the company; for the holding of an elec-

tion of directors, at which Carlisle and Williams, holding the majority of the stock, might elect such directors as they deemed best for the interests of the company—provided that Joseph C. Potts and Mason Brayman should always be elected two of said directors so long as any payments to be made by Carlisle and Williams under the contract should remain unpaid. In fact, this contract was for the sale to Carlisle and Williams, not only of the construction contract, but also of all the property and franchises of the corporation. The consideration of this sale and transfer stipulated for was $100,000 in cash and bills of exchange, $750,000 in six per cent. gold, first-mortgage land-grant bonds thereafter to be issued by the company, and $250,000 in the paid-up capital stock of the company; and this consideration was to be paid to Joseph C. Potts, Benjamin C. Potts and Columbus B. Guthrie. This contract was made for the benefit of Potts and Guthrie. It was signed by "The Cairo and Fulton Railroad Company, by their attorney, Jos. C. Potts." Brayman says that Potts had from him a power of attorney broad enough to embrace such a contract. Potts and Guthrie had sent to Brayman, March 11th, 1869, a telegram: "Potts goes to London. Send sealed authority to sell franchises, stock, land and all property of company; also extension contract." Brayman, in his letter transmitting the authority, said, "I enclose a letter of authority prepared upon your dispatch of the 11th. Having no knowledge of the terms of your negotiations, I could only make the authority general. *In law*, I cannot delegate the trust given me, by authorizing another to conclude arrangements. You will readily appreciate other reasons why it is most proper that the final adjustment and legal papers be made by me."

The contract fell through in the fall of 1869, but that is of comparatively little importance, for the contract never had any legal existence as against the company. Brayman had no power to authorize the making of such a contract. The resolution of the directors of May 9th, 1867, authorizing Brayman to make contracts for the sale, lease or disposal of the franchises, corporate rights and property of the company, gave

Brayman no power to make such a contract for the benefit of Potts and Guthrie.

In the spring of 1870 Brayman ceased to be president, and on the 20th of May, 1870, the new board of directors, by a resolution, canceled, annulled and set aside the construction contract, and all contracts made with Potts and Guthrie or either of them. At the time this resolution was passed, no work had been done by Potts and Guthrie, or any one else, upon the building of the road. There is some testimony that, by reason of the failure of Potts and Guthrie to complete twenty miles of the road, the company had forfeited its right to some federal or state aid, but, aside from that, the contract was broken by Potts and Guthrie, and the company was justified in law in declaring it at an end. The trial judge very properly instructed the jury that the circumstances and situation of the company justified a rescission of the contract, and that nothing in the acceptances implied any contract that the company would not avail itself of all its legal rights under the construction contract; and if the contractors failed to perform their contract obligations until they were clearly in default, the company was at liberty to act with respect to the contract as if the orders had not been given nor accepted.

The rescission of the contract by the company not being a wrongful act, the plaintiffs cannot hold the company in damages for that. But there is evidence tending to show that the money paid by the plaintiffs to Guthrie was used and applied for what might be considered the use of the company, and as a recovery by the plaintiffs of that sum, with interest, would be as just—and at the same time not in violation of law—as this verdict in damages is unjust and contrary to law—if the plaintiffs will remit the damages assessed beyond the amount of the money they paid to Guthrie and interest, the verdict may stand for that sum; otherwise, the verdict should be set aside and a new trial granted.